NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>DERRICK BAER,<br><br>Defendant. | Criminal Action No.: 15-417<br><br>**OPINION** |

**CECCHI, District Judge.**

## I.   INTRODUCTION

Defendant Derrick Baer ("Baer" or "Defendant") has been indicted for receiving child pornography and possessing child pornography. Presently before the Court is Defendant's motion to suppress (1) the child pornography found on his electronic media seized pursuant to a consent search on May 31, 2010; and (2) Defendant's statements to law enforcement on the day of the search. [ECF No. 21.] The Government opposed the motion. The Court has considered the submissions made in support of and in opposition to the instant motion, as well as the evidence offered during the evidentiary hearing held on July 12 and July 13, 2016. For the reasons set forth below, Defendant's motion is denied.

## II.   BACKGROUND

### A.   Factual Background

The facts giving rise to Defendant's motion to suppress are as follows. On May 31, 2010, at approximately 3:08 a.m., Defendant called 911 to report that his girlfriend, Lorraine Kosnac, was unresponsive. [Memorandum in Support of Pretrial Motions ("Def. Mot."), ECF No. 21 at 1;

First Tr.[1] at 24-25.] Local police officers and rescue personnel responded to Defendant's residence in Bloomsbury, New Jersey. [Def. Mot. at 1; Memorandum of the United States in Opposition to Pretrial Motions of Defendant Derrick Baer ("Govt. Opp."), ECF No. 25 at 3; Govt. Ex. 101, admitted into evidence July 12, 2016.] Officer Anthony Goodell of the Pohatcong Township Police Department was the first to arrive.[2] [First Tr. at 25.] Defendant met Officer Goodell at the front door and brought him to the back bedroom where Kosnac was lying on her back on a bed and was not breathing. [Id. at 26-27.] Emergency Medical Technicians were unable to revive Kosnac and she was pronounced dead at approximately 3:58 a.m. [Id. at 28-29; Govt. Ex. 304, admitted into evidence July 12, 2016.]

That same morning, Cynthia Marcinkowski, Kosnac's sister, called the police when she learned of Kosnac's death and told them Defendant had previously used homemade chloroform on Kosnac to knock her out for sex. [First Tr. at 31, 81-82.] Also that same morning, Sharon Mancini, Kosnac's mother, called the police with concerns that Defendant may have injured Kosnac two months earlier. [Id. at 31-32.]

The Warren County Prosecutor's Office ("WCPO") and the Pohatcong Township Police Department launched an investigation into the circumstances of Kosnac's death. At approximately 5:30 a.m., Sergeant Scott Robb of the Pohatcong Township Police Department arrived on the scene. [Id. at 77-78.] When Sergeant Robb arrived, Defendant was in his front yard. [Id. at 80.] Sergeant Robb brought a consent to search form and, after getting briefed by the other officers, asked Defendant for permission to search the house. [Id. at 79-80, 84-85.] Officer Goodell was present when Sergeant Robb asked Defendant for permission to search. [Id. at 88.] Although the

---

[1] "First Tr." refers to the transcript of the July 12, 2016 evidentiary hearing.
[2] Although Officer Goodell's shift ended at 3:00 a.m. on May 31, 2010, he received a call to report to Defendant's residence at 3:08 a.m. [Id. at 24-25.]

interaction was not recorded, Sergeant Robb and Officer Goodell both testified that Sergeant Robb read the consent to search form to Defendant. [Id. at 36, 84-85.] Defendant gave the officers permission to search his residence and signed the consent to search form, which was also signed by Sergeant Robb and Officer Goodell, at approximately 6:12 a.m. [Id. at 36-37, 85, 88; Govt. Ex. 201, admitted into evidence July 12, 2016.] The consent to search form provided for a "complete search" of the residence, without limitation, and authorized officers to remove "any documents, materials, things, or other property . . . ." [Govt. Ex. 201.] And, as part of his consent, Defendant acknowledged: "I have given this permission without fear, threat, or promises. I have been advised that the officers do not possess a search warrant and that I have a right to demand that they obtain a search warrant, I hereby give up that right." [Id.] On the back of the form, where Defendant signed, he affirmed that: "I understand that I have a right to refuse this permission to search"; "I can read and write the English language"; and "I understand I have the right to be present during the search, and to stop this search at any time." [Id.]

After Defendant signed the consent to search form, Sergeant Robb and WCPO Detective John Serafin returned to police headquarters to interview Marcinkowski. [First Tr. at 81-82.] She told the officers the following:

> (1) Two months earlier, Kosnac temporarily left Defendant after she discovered jars containing washcloths that smelled like ammonia under her bed and learned Defendant used chloroform on her while she was sleeping to rape her. When Kosnac confronted Defendant, he admitted the jars contained homemade chloroform that he learned to make on the Internet. [Govt. Ex. 401 at 5-6, admitted into evidence July 12, 2016; First Tr. at 31.]

> (2) Kosnac's daughter told Kosnac that one morning she had woken up to find Defendant standing over her with a washcloth in his hand. [Govt. Ex. 401 at 6.]

> (3) Kosnac told Marcinkowski that several years ago Defendant had a problem with "kiddy porn" in the form of pictures and books. [Id. at 6; First Tr. at 92.]

> (4) Kosnac developed an infected cyst on her rectal area that required surgery. At

3

the hospital, when Marcinkowski confronted Baer, he (a) admitted to using chloroform on Kosnac to have sex with her, (b) said he learned to make chloroform on the Internet, and (c) said he had a problem with porn. [Govt. Ex. 401 at 6.]

(5) Several years ago, Marcinkowski's teenage daughter spent the night at Defendant and Kosnac's residence. When Marcinkowski picked up her daughter in the morning, her daughter said while she was in the shower Defendant took a picture of her. When Marcinkowski confronted Defendant about this allegation, he denied it. [Id. at 6; First Tr. at 92-93.]

After interviewing Marcinkowski, Sergeant Robb and Detective Serafin returned to Defendant's residence to continue the investigation. [First Tr. at 93.] When they arrived—around 8:00 a.m.—the search was still underway. [Id.] At approximately 8:39 a.m., Sergeant Robb and Detective Serafin asked Defendant if he would speak to them. [Id. at 95.] Defendant agreed and Sergeant Robb, Detective Serafin, and Defendant moved to inside Sergeant Robb's police vehicle for the interview. [Id. at 95.][3] Sergeant Robb sat in the driver's seat, Detective Serafin sat in the front passenger's seat, and Defendant sat in the rear seat. [Id. at 96.] Defendant was not restrained in any way. [Id. at 97.]

Sergeant Robb recorded the interview with a portable digital recorder. [Id. at 96.] The Court listened to the recording at the evidentiary hearing. [Govt. Ex. 501, admitted into evidence July 12, 2016.] The officers administered Miranda warnings and explained to Defendant he was not under arrest. [First Tr. at 100-01.] The officers also gave Defendant a written Miranda card, which enumerated his Miranda rights. [Id. at 101.] Defendant initialed next to each of his Miranda rights and signed the Miranda card, which was also signed by Sergeant Robb, at 8:39 a.m. [Govt. Ex. 202, admitted into evidence July 12, 2016.] After being advised of his rights, Sergeant Robb

---

[3] At the hearing, Sergeant Robb testified he conducted the interview in his police vehicle because Defendant "signed the consent, which he has the right to be present during the search and the option to refuse us to continue the search at any time, and if I would have taken him away from the scene, he would no longer have that right." [Id. at 95.]

asked Defendant whether he was willing to proceed with the interview and Defendant responded "absolutely." [First Tr. at 104.] At the hearing, Sergeant Robb testified Defendant did not display any nervousness when he agreed to proceed with the interview. [Id. at 105.]

During the interview, Defendant spoke about his relationship with Kosnac. [Id.] Defendant indicted he and Kosnac had arguments concerning sex because he wanted anal sex and Kosnac did not. [Id. at 105-06.] He also stated he was "into" pornography. [Id. at 108.]

The interview next turned to Defendant's alleged use of chloroform on Kosnac. Sergeant Robb asked whether there were bottles of chloroform in the house, and noted that any bottles in the house would be found by the police. [Id. at 110-12.] Defendant denied having chloroform in the house and stated "you have my permission to search the house." [Id. at 112] At the hearing, Sergeant Robb testified Defendant acted "a little surprised when the chloroform question came up, but [his] demeanor didn't change." [Id. at 113.]

The officers then asked Defendant whether he researched how to make chloroform on his computer, and noted that Defendant's computers would be searched. [Id. at 114.] Defendant denied looking up how to make chloroform on his computers and said the officers would not find any evidence of Internet searches for chloroform on his computers. [Id.] At the hearing, Sergeant Robb testified Defendant did not express any nervousness or evasiveness when he was told the computers would be searched. [Id. at 114-15.] Sergeant Robb also testified that Defendant never objected to the officers removing his computers from the house. [Id. at 115.]

The officers then asked Defendant about a jar with a rag in it that was found in his house, and noted that it would be tested for chloroform. [Id. at 115-16.] Defendant said the rag should not test positive for chloroform and stated "if there's a way I can help you guys, I want to." [Id. at 116.] Finally, at the end of the interview, the officers asked Defendant whether he gave his

statement to the officers of his own free will, and Defendant confirmed he was not coerced or threatened in any way. [Id. at 123.] Defendant stated "I'm sitting here freely in the back of your patrol car." [Id.]

The search of Defendant's home concluded at approximately 11:50 a.m. [Id. at 61.] The officers seized numerous pieces of electronic media, including eighteen hard drives, four computers, sixty-eight 3½ inch floppy disks, and one CD-R. [Govt. Ex. 402, admitted into evidence July 12, 2016.] One of the floppy disks was labeled "Derrick's eyes ONLY" and another floppy disk was labeled "pics incriminating." [First Tr. at 131.] One of the hard drives was labeled "porn." [Id.]

Defendant retained an attorney, John J. Flynn, a few days after the search of his home. [Affidavit of John J. Flynn ("Flynn Aff."), ECF No. 26-2 ¶ 2.] On June 2, 2010, Flynn called Sergeant Robb and (1) advised that the police could no longer speak with Defendant, and (2) requested the police allow a voluntary surrender if charges were filed. [Govt. Ex. 401 at 11; Second Tr.[4] at 25.] Flynn did not ask about the electronic media seized. [Second Tr. at 25.]

On June 8, 2010, WCPO Detective Hernani Goncalves interviewed Defendant and Kosnac's minor daughter. [Govt. Ex. 401, at 11.] The daughter allegedly told Detective Goncalves she once woke up and found Defendant standing over her with a washcloth that smelled like paint. [Id.]

On May 31, 2010, the Warren County Medical Examiner conducted an autopsy on Kosnac. [Govt. Ex. 304, admitted into evidence July 12, 2016.] On October 29, 2010, the Medical Examiner issued the autopsy report. [Id.] The Medical Examiner concluded "exposure to chloroform" was a "[c]ontributory [c]ondition" of death, but the cause of death was cardiomegaly

---

[4] "Second Tr." refers to the transcript of the July 13, 2016 evidentiary hearing.

with atherosclerotic coronary artery disease. [Id.]

On August 10, 2011, Sergeant Robb obtained a search warrant from New Jersey Superior Court Judge Ann R. Bartlett to conduct forensic testing of Defendant's electronic media for "evidence pertaining to crimes including, but not limited to, Criminal Homicide, N.J.S.A. 2C:11-2, and/or Endangering the Welfare of a Child, N.J.S.A. 2C:24-4." [Govt. Ex. 402 ¶ 3.] On September 20, 2011, Sergeant Robb submitted a request to the New Jersey Regional Computer Forensics Laboratory ("RCFL") for forensic examination of Defendant's electronic media. [Govt. Ex. 305, admitted into evidence July 12, 2016.] The RCFL accepted the request but informed Sergeant Robb it could take up to one year for the examination to commence. [Id.] On July 3, 2012, the RCFL notified Sergeant Robb it was ready to begin the examination. [Govt. Ex. 307, admitted into evidence July 12, 2016.] Sergeant Robb brought the electronic media to the RCFL that same day. [Id.]

On October 2 and October 11, 2012, the RCFL reported its results. [Govt. Ex. 311, admitted into evidence July 13 2016; Govt. Ex. 312, admitted into evidence July 13, 2016.] It located a total of approximately thirteen confirmed images of child pornography; over 762 images of possible child pornography; and approximately sixty-three videos containing possible child pornography. [Govt. Ex. 311 at 3; Govt. Ex. 312 at 3.]

On December 4, 2011, Sergeant Robb and Detective Serafin learned that a person named Noel Gowran had recorded a conversation he had with Defendant on or around October 22, 2011, concerning the events that took place on the date of Kosnac's death. [Second Tr. at 10-11.] The Court listened to the recording during the evidentiary hearing. [Govt. Ex. 502, admitted into evidence July 13, 2016.] During this conversation, Defendant admitted he used chloroform on Kosnac, which he learned to make from "pornography." [Second Tr. 14-19.] Defendant discussed

the effects of chloroform versus Novocain and how the substances are administered. [Id. at 15-16.] When Gowran asked Defendant how he knew this information, Defendant responded "I'm not stupid," and "I didn't graduate from Monmouth Fire Academy for nothing." [Id. at 14-16.] Defendant also told Gowran: "Yeah, I let the police search my house, I gave them a signed copy that says they can search my house." [Id. at 20.] During this conversation, Defendant did not complain of being coerced to speak to the police or give consent to search his home.

On November 13, 2012, the WCPO charged Defendant by complaint with one count of possessing child pornography in violation of N.J.S.A. 2C:24-4b(5)(b). [Def. Mot. at 3; Govt. Opp., Ex. 16.] A grand jury indicted Defendant on this charge on or about September 24, 2014.[5] Shortly thereafter, federal law enforcement began investigating Defendant and, on or about January 28, 2015, the RCFL reported results of its re-testing of one of the hard drives seized from the May 31, 2010 search of Defendant's home. [Govt. Ex. 314, admitted into evidence July 13, 2016.] The subsequent examination revealed Defendant may have used the peer-to-peer program Limewire to download or attempt to download files containing child pornography. [Id.]

## B.   Procedural History

On February 5, 2015, Defendant was charged by complaint with possession of child pornography in violation of 18 U.S.C. § 2252A(a)(5)(B) and receipt of child pornography in violation of 18 U.S.C. § 2252A(a)(2). [ECF No. 1.] On February 6, 2015, Defendant was arrested and had his initial appearance before Magistrate Judge Cathy L. Waldor. [ECF Nos. 2-4.] At that time, Defendant consented to detention with a right to make a bail application at a later time and was ordered to temporary detention. On February 11, 2015, Defendant's bail application was

---

[5] On February 20, 2015, after federal charges were filed, the state charges were dismissed. [Def. Mot. at 3.]

denied and Defendant was ordered to detention. [ECF No. 10.]

On August 20, 2015, a federal grand jury returned a two-count indictment charging Defendant with possession of child pornography in violation of 18 U.S.C. § 2252A(a)(5)(B) and receipt of child pornography in violation of 18 U.S.C. § 2252A(a)(2). [ECF No. 16.] On September 9, 2015, Defendant was arraigned before this Court and entered a plea of not guilty. [ECF No. 17.] On December 22, 2015, Defendant filed a pretrial motion to suppress the evidence against him. [ECF No. 21.] The Government filed a brief in opposition to Defendant's motion on February 16, 2016. [ECF No. 25.] Defendant filed a reply on February 29, 2016. [ECF No. 26.] The Court held an evidentiary hearing on Defendant's motion on July 12 and July 13, 2016. Following the evidentiary hearing, both parties filed supplemental submissions on July 26, 2016. [ECF Nos. 37, 38.] The Court held oral argument on Defendant's motion on July 28, 2016. Following oral argument, the Government filed a supplemental submission on August 3, 2016. [ECF No. 40.]

## III.    DEFENDANT'S FOURTH AMENDMENT CLAIMS

Defendant argues the child pornography found on his electronic media should be suppressed because it was obtained in violation of his Fourth Amendment rights. In deciding whether Defendant's Fourth Amendment rights were violated, the Court must consider the following: (1) whether Defendant's consent to search was voluntarily and freely given; and (2) whether the search warrant complies with the Fourth Amendment.

### A.    Legal Standard

The Fourth Amendment to the U.S. Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. To prevail on a motion to suppress, a defendant generally bears the burden

of proving the challenged search or seizure was unreasonable under the Fourth Amendment. <u>See</u> <u>Unitred States v. Acosta</u>, 965 F.2d 1248, 1257 n.5 (3d Cir. 1992) ("The proponent of a motion to suppress has the burden of establishing that his Fourth Amendment rights were violated."). However, once the defendant has established a basis for his motion, <u>i.e.</u>, that the search or seizure was conducted without a warrant, the burden shifts to the government to show the search or seizure was reasonable. <u>United States v. Johnson</u>, 63 F.3d 242, 245 (3d Cir. 1995). The Government must demonstrate by a preponderance of the evidence the challenged evidence is admissible. <u>See</u> <u>United States v. Matlock</u>, 415 U.S. 164, 178 n.14 (1974).

**B.      Analysis**

**1.      Defendant's consent was voluntary.**

Defendant first argues the May 31, 2010 warrantless search of his home violated the Fourth Amendment. This argument fails because Defendant consented to the search.

The Fourth Amendment prohibits unreasonable searches and seizures. <u>See</u> <u>Illinois v. Rodriguez</u>, 497 U.S. 177, 183 (1990); <u>United States v. Stabile</u>, 633 F.3d 219, 230 (3d Cir. 2011). In general, a "warrantless entry into a person's house is unreasonable <u>per se</u>." <u>See</u> <u>Payton v. New York</u>, 445 U.S. 573, 586 (1980). There are, however, exceptions to this rule. <u>See</u> <u>Jones v. United States</u>, 357 U.S. 493, 499 (1958).

"It is . . . well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conduced pursuant to consent." <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 219 (1973); <u>see also</u> <u>Florida v. Jimeno</u>, 500 U.S. 248, 250-51 (1990) (approving consent searches because a search permitted by consent is reasonable). To justify a search based on consent, the Government "has the burden of proving that the consent was, in fact, freely and voluntarily given." <u>Bumper v. North Carolina</u>, 391 U.S. 543, 548 (1968).

10

Here, Defendant voluntarily and freely gave consent to search his home.  Courts consider the voluntariness of consent by examining the totality of the circumstances.  United States v. Price, 558 F.3d 270, 278 (3d Cir. 2009); Schneckloth, 412 U.S. at 224.  Courts consider factors such as "the age, education, and intelligence of the subject; whether the subject was advised of his or her constitutional rights; the length of the encounter; the repetition or duration of the questioning; and the use of physical punishment."  Price, 558 F.3d at 278 (citing Schneckloth, 412 U.S. at 226).  Courts also consider "'the setting in which the consent was obtained [and] the parties' verbal and non-verbal actions.'"  Id. (quoting United States v. Givan, 320 F.3d 452, 459 (3d Cir. 2003)).

In this case, Defendant signed a consent to search form which advised him of his constitutional right to refuse consent to the search.  See United States v. Mendenhall, 446 U.S. 544, 558-59 (1980) (knowledge of right to decline consent is highly relevant to determination of whether consent was voluntary and substantially lessens the probability that law enforcement conduct could be viewed as coercive); United States v. Velasquez, 885 F.2d 1076, 1082 (3d Cir. 1989) (consent was voluntary because, among other factors, defendant was provided a written consent to search form that was explained to her and which she read).[6]  Defendant points to the lack of initials on the consent to search form to contradict voluntary consent.  [Supplemental Motion to Suppress by Derrick Baer ("Def. Supp. Br."), ECF No. 37 at 3.]  However, Defendant clearly signed the consent to search form, which advised Defendant of his right to refuse consent and to require the officers to obtain a search warrant.  [Govt. Ex. 201.]  By signing the form, Defendant affirmed he understood he had "a right to refuse this permission to search" and "the

---

[6] Even though Defendant was advised of his right to refuse consent, the Government does not need to inform the subject of his right to refuse consent.  See Schneckloth, 412 U.S. at 227 (noting it is not essential for prosecution to show that the consenter knew of the right to refuse consent to establish consent was voluntary).

right to . . . stop the search at any time," and Defendant affirmed that even though he had "been advised that the officers do not possess a search warrant and that [he] ha[s] a right to demand that they obtain a search warrant, [he] hereby give[s] up that right." [Id.] Such unambiguous affirmation by Defendant shows his consent to search was voluntary. See United States v. Hernandez, 76 F. Supp. 2d 578, 581 (E.D. Pa. 1999) (finding voluntary consent where defendant signed a consent form explaining the police do not have a warrant and there is a constitutional right to refuse permission to search), aff'd, 263 F.3d 160 (3d Cir. 2001).

Defendant argues the reading and explanation of the consent to search form should have been recorded because several officers who were present at the scene were equipped to record the event. [Defendant's July 26, 2016 Supplemental Brief ("Def. Supp. Br."), ECF No. 37 at 2.] At the hearing, the Court heard testimony that at least some of the officers at the scene possessed the capability to either audio record or video record the discussion with Defendant regarding a consent search of his home.[7]

Defendant concedes there is no requirement that officers record the reading and explanation of a consent to search form. [Def. Supp. Br. at 3.] Sergeant Robb testified he read the consent to search form to Defendant and Officer Goodell was present. [First Tr. at 84-85.] Officer Goodell testified he witnessed Sergeant Robb read the consent to search form to Defendant. [Id. at 36.] As such, Defendant signed the form in the presence of two law enforcement officers who testified consistently about the reading and explanation of the consent to search form to Defendant.

---

[7] For instance, Officer Goodell testified he had a body microphone on the day of the search but had turned it off because his shift ended prior to arriving at Defendant's home. [First Tr. at 46.] Officer Goodell also testified that one or more officers on the scene likely had a car equipped with an operable dashboard camera. [Id. at 49-51.] Sergeant Robb testified he had a portable digital recorder with him on the day of the search that he used to record Defendant's interview, but did not use to record the discussion with Defendant regarding a consent search of his home. [Id. at 96.]

[Id. at 36-38, 84-85.] The Court finds the officers' testimony credible and credits their version of events on this point. See United States v. Bonner, Criminal No. 1:09-CR-0072-02, 2010 WL 1628989, at *5 (M.D. Pa. Apr. 20, 2010).

Next, Defendant was not impaired at the time he gave consent or coerced into giving consent. Defendant's assertion that he was "completely unnerved," [Def. Aff. ¶ 3], and "unable to think straight," [Def. Aff. ¶ 8], prior to signing the form was refuted by the officers' testimony of his cooperative, unimpaired, and calm demeanor. Officer Goodell testified Defendant was "cooperative," "didn't appear to be in duress," did not appear to be impaired by alcohol or drugs, and was not crying or hysterical. [First Tr. at 34, 44-45.] Officer Goodell further testified when Sergeant Robb read the consent to search form, Defendant appeared to be paying attention, did not appear fatigued, and did not appear impaired in any way. [Id. at 41-42.]

Sergeant Robb testified, although Defendant appeared upset by Kosnac's death, Defendant "was still calm," "wasn't . . . agitated or anything like that," and had "a calm demeanor." [Id. at 83.] Sergeant Robb testified he had no concerns about Defendant's mental state at the time he asked for consent and Defendant did not appear to be under the influence of alcohol or drugs. [Id. at 84.]

Notably, Defendant does not allege the police inflicted any physical harm, used any force or threat of force, or even touched him prior to requesting and obtaining his consent. He was at home, was never in custody or under arrest, was never handcuffed, and no guns were drawn. [Id. at 42.] These factors tend to demonstrate the voluntariness of Defendant's consent. See, e.g., Price, 558 F.3d at 279-80 (finding consent voluntary based in part on "low key" circumstances of the law enforcement encounter with defendant, such as the fact that defendant "was asked for consent as she stood on her own property," "officers who were there did not have their guns

13

drawn," and "[a]t no point was [defendant] arrested, handcuffed, or even touched"); United States v. Kim, 27 F.3d 947, 955 (3d Cir. 1994) (finding consent voluntary based in part on the fact that "[t]here was no threat of force"); United States v. Vaghari, 653 F. Supp. 2d 537, 545 (E.D. Pa. 2009), aff'd, 2012 WL 4707063 (3d Cir. Oct. 4, 2012) (noting that agent did not touch defendant and defendant was in his own apartment).

Moreover, the testimony at the hearing disproves Defendant's allegations of coercive conduct by law enforcement. Contrary to Defendant's assertion that Sergeant Robb told him he would be taken into custody if he did not sign the consent to search form, [Def. Aff. ¶ 7], Officer Goodell, who witnessed the interaction between Sergeant Robb and Defendant concerning the consent to search, testified that Sergeant Robb never told Defendant he would be taken into custody if he did not sign the consent to search form. [First Tr. at 40.] Further, Defendant's assertion he only signed the form so that he could leave his house to be with his children, [Def. Aff. ¶ 8], is refuted by Officer Goodell and Sergeant Robb's testimony that, at no point, did Defendant ask to leave the premises to be with his children. [First Tr. at 41, 87.]

Finally, at least twice after signing the consent to search form, Defendant reaffirmed his consent. See United States v. Vazquez, 858 F.2d 1387, 1390 (9th Cir. 1988) (finding voluntary consent because, among other factors, defendant repeated his consent to the police's request to search). A few hours after signing the consent to search form, Defendant reaffirmed his consent to Sergeant Robb and Detective Serafin during his recorded interview: "Well you have my permission to search the house," in response to Sergeant Robb's question as to whether the officers would find evidence of chloroform use in the house. [First Tr. at 112.] Also during that interview, Defendant noted his desire to cooperate with law enforcement, stating "if there's a way I can help you guys, I want to." [Id. at 116.] And, almost eighteen months later, when Defendant spoke to

14

Gowran about his interactions with the police on the day of the search, Defendant did not mention ever objecting to the search or to the police's treatment of him that morning. Defendant even told Gowran: "Yeah, I let the police search my house. I gave them a signed copy that says they can search my house." [Second Tr. at 20.] Thus, Defendant's subsequent affirmations of consent show Defendant voluntarily and freely gave law enforcement consent to search his home. Considering the totality of the circumstances, the Court is satisfied Defendant's consent was, in fact, freely and voluntarily given.

### 2.      The search warrant complies with the Fourth Amendment.

Defendant next argues the supposed defects in the search warrant and the delay in obtaining the search warrant violated his Fourth Amendment rights. These arguments fail because the search warrant is supported by probable cause, is sufficiently particular, and the delay in obtaining the search warrant was reasonable.

### a.      The search warrant was based on probable cause.

Defendant argues the search warrant lacked probable cause to search for evidence of child pornography. This argument fails because Judge Bartlett, the New Jersey Superior Court Judge who issued the search warrant, had a substantial basis for concluding that probable cause existed for finding child pornography on Defendant's electronic media.

A judge may find probable cause when, viewing the totality of the circumstances, "there is a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983); United States v. Hodge, 246 F.3d 301, 305 (3d Cir. 2001). The reviewing court need not determine whether probable cause actually existed, but only whether there was "a 'substantial basis' for finding probable cause." United States v. Jones, 994 F.2d 1051, 1054 (3d Cir. 1993). "[T]he resolution of doubtful or marginal cases in this area

should be largely determined by the preference to be accorded to warrants." Id. at 1057-58

(quoting United States v. Ventresca, 380 U.S. 102, 109 (1965)).

The Government points to five pieces of information in the search warrant application

that it maintains creates a basis for probable cause to search for evidence of child pornography.

First, Kosnac told Marcinkowski that "several years ago [Defendant] had a problem with kiddy

porn in the form of pictures and books." [Govt. Ex. 401 ¶ 5(e), admitted into evidence July 12,

2010.][8] Second, Defendant told Marcinkowski "he had a problem with porn." [Id.]  Third,

Defendant allegedly took a photograph of Marcinkowski's minor daughter while she was

showering. [Id.] Fourth, Defendant's electronic media included floppy disks labelled "Derrick's

eyes ONLY" and "pics incriminating," and a hard drive marked "porn." [Id. ¶ 5(g).]  Finally,

Defendant's minor daughter reported she once woke up and found Defendant standing over her

with a washcloth, raising the possibility to law enforcement Defendant may have used

chloroform on his minor daughter. [Id. ¶ 5(i).] These pieces of information, taken together,

create a substantial basis for concluding probable cause existed for finding child pornography on

Defendant's electronic media.

Defendant argues the witness accounts included in the search warrant application were

not a reliable basis for probable cause because they were based on hearsay.  Credible hearsay

statements, however, can be the basis of probable cause for a search warrant.  See, e.g., United

States v. Ventresca. 380 U.S. 102, 108 (1965) (noting hearsay may be the basis for a search

warrant as long as there is a substantial basis for crediting the hearsay (citing Jones v. United

---

[8] Defendant argues it is significant that law enforcement found no "kiddy porn in the form of pictures and books" despite their exhaustive search of Defendant's residence on May 31, 2010. [Def. Supp. Br. at 20.] This argument is unavailing. Pictures and books can be electronic and, as is the case here, can be stored on one's electronic media.

States, 362 U.S. 257, 269-70 (1960)).  As Sergeant Robb explained at the hearing, the suspicious

labels found on some of the electronic media items (i.e., "pics incriminating, "porn," and

"Derrick's eyes ONLY"), taken together with the information provided by Marcinkowski that

Kosnac once stated Defendant "had a problem with kiddy porn" and that Defendant had taken a

photograph of Marcinkowski's minor daughter while showering, contributed to the possibility

that child pornography would be found on Defendant's electronic media.  [Second Tr. at 126-

27.]  Sergeant Robb further testified the large amount of electronic media found in the house

(eighteen hard drives, sixty-eight floppy disks, four computers, and one CD-R) made him want

to examine these items to see if child pornography would be located within.  [Id. at 127.]

      Moreover, the lab results confirming that chloroform was on the rag found in the jar in

Defendant's home and the autopsy report that chloroform was found in Kosnac's body further

confirmed a central aspect of the account Kosnac reportedly gave Marcinkowski concerning

Defendant's conduct—his use of chloroform on her to knock her out for sex.  [First Tr. at 129-

32.]  This makes it even more likely that Kosnac's account of Defendant's problem with child

pornography was credible.  See United States v. Bush, 647 F.2d 357, 363 (3d Cir. 1981) (police

need not corroborate every detail of an informant's report to establish sufficient veracity of

informant for probable cause).  As such, hearsay concerning Defendant's previous problem with

"kiddy porn" and his other sexual predilections, along with corroborating information, all

provided a substantial basis for probable cause that child pornography would be found on

Defendant's electronic media.

           b.      The search warrant satisfies the particularity requirement of the
                   Fourth Amendment.

Defendant argues the search warrant was overbroad and lacks particularity. This argument fails because the search warrant particularly described the places to be search for child pornography.

The Fourth Amendment requires that warrants particularly describe the place to be searched and the persons or things to be seized. U.S. Const. amend. IV; United States v. Yusuf, 461 F.3d 374, 393 (3d Cir. 2006). General warrants violate the Fourth Amendment because they authorize "a general, exploratory rummaging in a person's belongings." Coolidge v. New Hampshire, 403 U.S. 443, 467 (1971). For a warrant to be invalidated as general, it must "vest the executing officers with unbridled discretion to conduct an exploratory rummaging through [defendant's] papers in search of criminal evidence." United States v. Christine, 687 F.2d 749, 753 (3d Cir. 1983). In contrast, an overly broad warrant "describe[s] in both specific and inclusive generic terms what is to be seized," but it authorizes the seizure of items as to which there is no probable cause. Id. at 753-54.

Here, the search warrant was neither general nor overbroad. The search warrant described in detail each computer, hard drive, floppy disk, and CD the police sought to search for evidence related to specific criminal offenses. It also expressly incorporated Sergeant Robb's affidavit applying for the search warrant concerning the criminal offenses at issue and possible electronic evidence pertaining to those offenses that witnesses referred to, such as child pornography and Internet searches for making chloroform.

Defendant argues the search warrant gave officers unlimited discretion to search for whatever they wished. This argument, however, is simply untrue. The search warrant narrowed the search to evidence relating to three enumerated New Jersey State criminal offenses: Criminal

Homicide, Manslaughter, and Endangering Welfare of Children.[9]  [Govt. Ex. 402 ¶¶ 1, 3.]  By limiting the search for evidence relating to these specific crimes, the search warrant did not give law enforcement unlimited discretion to search for whatever they wished.  See, e.g., Yusuf, 461 F.3d at 395 (finding that a limitation in a warrant for agents to search for evidence of specifically enumerated federal crimes helps satisfy the particularity requirement).

Moreover, the explicit incorporation of Sergeant Robb's affidavit on the face of the search warrant, [Govt. Ex. 402 ¶ 4], provided further particularity for the search of Defendant's electronic media.  See Bartholomew v. Pennsylvania, 221 F.3d 425, 429 (3d Cir. 2000) (finding that incorporation of affidavit in the search warrant limits officers' discretion regarding what they are entitled to seize); United States v. Johnson, 690 F.2d 60, 64 (3d Cir. 1982) ("When a warrant is accompanied by an affidavit that is incorporated by reference, the affidavit may be used in construing the scope of the warrant.").  Sergeant Robb's affidavit specified that the search of Defendant's electronic media will reveal evidence of child pornography and Internet searches for making chloroform.  [Govt. Ex. 401 ¶ 6.]  The affidavit described Defendant's "problem with kiddy porn in the form of pictures and books" and referenced labels found on Defendant's electronic media such as "pics incriminating," "Derrick's eyes ONLY," and "porn." [Id. ¶¶ 5(e), 5(g).]  The incorporation of Sergeant Robb's affidavit demonstrated law enforcement's intent to find these specific types of evidence on Defendant's electronic media, it did not authorize a general search for evidence of any crime.

Defendant focuses on the catch-all phrase "including but not limited to."  Defendant argues a search for evidence of crimes "including but not limited to" Criminal Homicide,

---

[9] The offense of Endangering Welfare of Children includes child pornography-related offenses such as knowingly possessing or viewing through any means an item depicting the sexual exploitation or abuse of a child.  See N.J. Stat. Ann. § 2C:24-4(b)(5)(a).

19

Manslaughter, and Endangering Welfare of Children evinced law enforcement's intent to

conduct a "wholesale search." In Yusuf, the Third Circuit found the use of a catch-all provision,

which authorized the Government to search for evidence of money laundering "and illegal

activities," did not render the warrant unconstitutionally overbroad. Yusuf, 461 F.3d at 396. In

Andresen v. Maryland, 427 U.S. 463 (1976), the search warrant at issue added the phrase

"together with other fruits, instrumentalities and evidence of crime at this (time) unknown" to the

list of evidence to be searched. The Supreme Court rejected the argument that this catch-all

phrase rendered the warrant overbroad, because the context of the warrant made clear this phrase

related to the suspected crime specified in the rest of the sentence and in the affidavit. Andresen,

427 U.S. at 479-82; see also United States v. Miknevich, 638 F.3d 178, 182 (3d Cir. 2011)

(noting a warrant must be read as a whole, and a supporting affidavit "is to be read in its entirety

and in a common sense, nontechnical manner"). In this case, the phrase "including but not

limited to" is in the same sentence as the suspected crimes, and should be read in the context of

an incorporated affidavit that describes in detail the specific types of evidence on Defendant's

electronic media (i.e., child pornography and Internet searches for making chloroform). As such,

the search warrant was not overbroad and was sufficiently particular under the Fourth

Amendment.

> c.   The amount of time to obtain and execute the search warrant did
>       not violate the Fourth Amendment.

Defendant argues the fourteen-month delay it took for law enforcement to obtain the

search warrant to conduct a forensic search of his electronic media violated his Fourth

Amendment rights. This argument fails because the delay was not unreasonable under the

circumstances of this case.

20

The Supreme Court has adopted a balancing test to determine whether a seizure is reasonable. A court must "balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." United States v. Place, 462 U.S. 696, 703 (1983). In balancing these interests, courts may consider whether the individual consented to a search and seizure. See United States v. Stabile, 633 F.3d 219, 235 (3d Cir. 2011). "[W]here a person consents to search and seizure, no possessory interest has been infringed because valid consent, by definition, requires voluntary tender of property." Id.; see also United States v. Laist, 702 F.3d 608, 618 (11th Cir. 2012).

In applying this balancing test to the seizure of Defendant's electronic media, the Court must consider the extent of the intrusion on Defendant's possessory interests given the totality of the circumstances. Because Defendant provided consent, did not limit its scope, and did not revoke it, Defendant had little—if any—personal interest in his electronic media. See Stabile, 633 F.3d at 235. First, as discussed above, Defendant consented to the seizure of his property.

Second, Defendant did not limit the scope of his consent. The consent to search form specifically provided for a "complete search" of Defendant's residence, without limitation, including all "documents, materials, things, or other property" considered pertinent by law enforcement. [Govt. Ex. 201.] As such, Defendant provided a general consent and did not restrict his consent to certain subject matters, namely, items related to the allegations concerning his use of chloroform on Kosnac. Pursuant to Defendant's general consent to a "complete search" of his home, law enforcement was not restricted to looking only for items related to specific offenses, or to only those offenses for which the police had probable cause at the time of the search. See Schneckloth, 412 U.S. 218 (search of property, without warrant and without

probable cause, but with proper consent voluntarily given, is valid under the Fourth Amendment). Thus, given Defendant's general consent to search his residence, law enforcement was free to search the residence for and seize any evidence related to the use of chloroform on Kosnac, child pornography, or any other criminal offense located within the residence.

Third, it is undisputed that Defendant never sought return of his electronic media. See United States v. Johns, 469 U.S. 478, 487 (1985) (defendants who "never sought return of the property" cannot argue delay adversely affected Fourth Amendment rights). Defendant claims he did not seek return of his property because he was following his prior lawyer's advice not to ask for the return of the items. The bounds of Defendant's consent and the reasonableness of law enforcement's retention of the electronic media, however, are evaluated based on objective facts, not Defendant's intent. See, e.g., Florida v. Jimeno, 500 U.S. 248, 251 (1991) (for consensual searches, the standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of "objective" reasonableness, not the subjective belief of the suspect giving consent); United States v. Marshall, 348 F.3d 281, 287 (1st Cir. 2003) ("The standard for measuring the scope of a search is one of objective reasonableness, not the consenting party's subjective belief.").

Defendant also claims he did not seek the return of his electronic media because he was invoking his "Fifth Amendment right not to speak with law enforcement." This argument similarly fails. His attorney at the time, John Flynn, could have sought the return of the property on Defendant's behalf, obviating any need for Defendant to speak with law enforcement. At the hearing, Sergeant Robb testified that Flynn, Defendant's prior lawyer, never requested that any of Defendant's property be returned. [Second Tr. at 25.] Defendant's Fifth Amendment interests are entirely separate from the Fourth Amendment issue of whether it was objectively

reasonable for law enforcement to act pursuant to Defendant's unrevoked consent. See United States v. Beckmann, 786 F.3d 672, 679 (8th Cir. 2015) ("Where a suspect provides general consent to search, only an act clearly inconsistent with the search, an unambiguous statement, or a combination of both will limit the consent.").

The Court next considers the degree to which the seizure and retention of the electronic media was necessary for the promotion of legitimate governmental interests. Place, 462 U.S. at 703-04. Law enforcement maintained a substantial interest in retaining the electronic media until the completion of a forensic review by the RCFL because law enforcement had a compelling and substantial interest in pursuing the investigation of Kosnac's death and the claims of Defendant's penchant for child pornography. On October 29, 2010, after the electronic media was seized, the Medical Examiner issued an autopsy report which corroborated Marcinkowski's statements that Defendant used chloroform on Kosnac to incapacitate her for sex. [Govt. Ex. 304.] Moreover, Sergeant Robb's testimony established the amount of time taken to apply for the search warrant was reasonable given the circumstances that precluded obtaining it sooner. After having been initially impeded from pursuing a search warrant because of a prosecutor with a differing view of the case,[10] Sergeant Robb continued his investigation once a new prosecutor was assigned to the case in 2011. [First Tr. at 125-28, 131-32.] Additional time was then needed to compile the evidence for the new prosecutor, for the new prosecutor to review such evidence, for Sergeant Robb to draft a search warrant application, and have the search warrant application reviewed by the prosecutor before it could be presented to a judge. [Id. at 132; Second Tr. at 65.]

---

[10] At the hearing, Sergeant Robb testified that the original prosecutor denied his request to apply for a search warrant and said "[h]ow do we know that she didn't like it?" [First Tr. at 127.] Sergeant Robb testified that he understood the original prosecutor's comment to mean he was not able to get a search warrant in the case. [Id.]

The Government's course of conduct was reasonable under the totality of the circumstances given Defendant's diminished personal interest and the Government's substantial interest in retaining and searching the electronic media for evidence of crimes. Even if the Government could have moved faster to obtain a search warrant, the Government is not required to pursue the least intrusive course of action. Illinois v. Lafayette, 462 U.S. 640, 647 (1983). Accordingly, the Government's seizure and retention of the electronic media for approximately fourteen months before obtaining a search warrant does not amount to an unreasonable seizure under the Fourth Amendment.

Defendant further argues the delay it took for law enforcement to execute the search warrant violated his Fourth Amendment rights. This argument also fails. Once the search warrant was authorized on August 10, 2010, it took Sergeant Robb—who had never before handled a case involving the forensic review of electronic media by the RCFL—approximately forty days to ascertain the steps for submission of the electronic media to the RCFL. This delay is not unreasonable given (1) Sergeant Robb's other law enforcement duties, and (2) the fact that Sergeant Robb needed to ascertain, for the first time, the forensic review process with the RCFL. [First Tr. at 126, 137; Second Tr. at 7-8.] Finally, the reasonableness of the delay is illustrated by the fact that, on the same day Sergeant Robb received notification the RCFL was ready to accept the electronic media for review, he submitted the items to the RCFL. [First Tr. at 149.]

        d.     Suppression is not warranted because law enforcement acted in good faith.

Even if the search warrant was defective or the amount of time to apply for and execute the search warrant was unreasonably long, suppression in this case is unwarranted because law enforcement acted in good faith.

Under the good faith exception to the exclusionary rule, suppression of evidence is "inappropriate when an officer executes a search warrant in objectively reasonable reliance on a warrant's authority." See United States v. Hodge, 246 F.3d 301, 307 (3d Cir. 2001) (quoting United States v. Williams, 3 F.3d 69, 74 (3d Cir. 1993)). The Third Circuit has identified four circumstances where an officer's reliance on a search warrant would not be reasonable and, in turn, not trigger the good faith exception:

> (1) [when] the magistrate [judge] issued the warrant in reliance on a deliberately or recklessly false affidavit;
>
> (2) [when] the magistrate [judge] abandoned his or her judicial role and failed to perform his or her neutral and detached function;
>
> (3) [when] the warrant was based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable'; or
>
> (4) [when] the warrant was so facially deficient that it failed to particularize the place to be searched or the things to be seized.

Hodge, 246 F.3d at 308. None of these exceptions apply here.

As described above, there was no reckless or grossly negligent conduct by Sergeant Robb in applying for the search warrant.[11] He then reasonably relied on the Superior Court Judge's approval of the warrant because the judge did not issue it on a deliberately or recklessly false affidavit; did not abandon her judicial role; nor was the warrant so lacking in indicia of probable cause or facially deficient. Moreover, the search warrant affidavit disclosed that Defendant's electronic media items had been seized by law enforcement on May 31, 2010. [First Tr. at 135-36.] Thus, the judge who reviewed the August 10, 2011 search warrant was fully aware that

---

[11] Defendant points to Sergeant Robb's failure to provide a receipt of the property taken immediately after the search and the lack of the phrase "in sum of substance" before quotation marks in recounting Marcinkowski's statements in the search warrant affidavit. This does not negate the ample record of Sergeant Robb acting in good faith.

these items had been in law enforcement's possession for approximately fourteen months. Thus, even assuming the search warrant was defective or the amount of time to apply for and execute the search warrant was unreasonably long, the exclusionary rule should not apply in this case.

## IV.     DEFENDANT'S FIFTH AMENDMENT CLAIMS

Defendant also moves to suppress the statements he made to law enforcement on the day of the search. Defendant argues the statements were obtained in violation of his Fifth Amendment rights.

### A.     Legal Standard

The Fifth Amendment to the U.S. Constitution provides "no person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. In Miranda v. Arizona, 384 U.S. 436 (1966), the U.S. Supreme Court concluded "without proper safeguards the process of in-custody interrogation . . . contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." 384 U.S. at 467. The Government must take certain steps to protect an individual's Fifth Amendment privilege against self-incrimination, including notifying a suspect interrogated while in police custody he has a right to remain silent, any statements he makes may be used against him in court, and he has the right to have an attorney present at the interrogation. Thompson v. Keohane, 516 U.S. 99, 107 (1995); see also Miranda, 384 U.S. at 479. A defendant may waive these rights and make a statement, "provided the waiver is made voluntarily, knowingly and intelligently." Miranda, 384 U.S. at 444. On a motion to suppress statements as involuntary, the Government must demonstrate by a preponderance of the evidence (1) the defendant was properly advised of his Miranda rights; (2) the defendant voluntarily, knowingly, and intelligently waived said rights; and (3) the ensuing statement was voluntary. Colorado v. Connelly, 479 U.S.

157, 169 (1986).

### B.    Analysis

Defendant argues the statements he made in response to Sergeant Robb and Detective Serafin's questions in Sergeant Robb's police car should be suppressed because they were obtained in violation of his Fifth Amendment rights.  This argument fails because Defendant's statements were voluntary and made subsequent to a valid Miranda waiver.

To determine the sufficiency of Miranda warnings and any waiver of rights, courts examine the totality of the circumstances surrounding questioning.  See United States v. Velasquez, 885 F.2d 1076, 1086 (3d Cir. 1989); Arizona v. Fulminante, 499 U.S. 279 (1991).  In analyzing the totality of the circumstances, a court "must look at the facts of a particular case, including the background, experiences, and conduct of the suspect."  Velasquez, 885 F.2d at 1068.  Potential circumstances affecting the voluntariness of statements include:  (1) evidence of police coercion; (2) the length and location of the interrogation; (3) the defendant's maturity, physical condition, mental health, and level of education; (4) whether Miranda warnings were given; and (5) whether an attorney was present for the interview.  See United States v. Swint, 15 F.3d 286, 289 (3d Cir. 1994).  Statements following Miranda warnings and waivers are rarely deemed involuntary.  See North Carolina v. Butler, 441 U.S. 369, 373 (1979) ("An express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver.").

Under the totality of the circumstances, the Court finds Defendant's statements were voluntary and subsequent to a valid Miranda waiver.  First, there is no evidence of police coercion. See Swint, 15 F.3d at 289 ("[A] court will not hold that a confession was involuntary unless it finds that it was the product of 'police overreaching.'").  Defendant states he agreed to be

interviewed by Sergeant Robb and Detective Serafin "because [he] believed it was the only way that [he] could be allowed to leave the scene and be with [his] children." [Def. Aff. ¶ 11.] The only evidence supporting Defendant's version of events, however, is his own affidavit.

As Sergeant Robb and Sergeant Goodell independently testified, Defendant was asked to remain on the scene during the search of his home so he could exercise his right to stop the search, and was asked to stay in the front yard for officer safety reasons. [First Tr. at 42, 62-63, 89-90.] The consent to search form explicitly acknowledges Defendant's right to stop the search. [Govt. Ex. 201.]   Contrary to Defendant's assertions otherwise, the officers' testimony made clear Defendant was not told he could not leave the premises, and Defendant never asked to leave. [First Tr. at 42-43, 71-72, 87, 89-90.] Sergeant Goodell testified Defendant did not ask about his children or ask to leave to be with his children. [Id. at 32.]   Sergeant Robb and Sergeant Goodell were credible and consistent in their testimony, and the Court credits their version of events on this point. See Bonner, Criminal No. 2010 WL 1628989, at *5.

As heard from the recording of the interview, at the end of Defendant's statement, when Sergeant Robb asked him whether he gave his statement of his own free will and whether anyone coerced him, threatened him, or made him any promises to give the statement, Defendant replied "[n]o" and did not mention feeling impaired or coerced in any way. [First Tr. at 123.] Moreover, Defendant's statement to the police "if there's a way I can help you guys I want to," and the clarity, tone, and responsiveness of his answers to the officers' questions further refute any claim of feeling coerced. [Id. at 116.]

In addition, Defendant's claim he was coerced into providing a statement to law enforcement is belied by his conversation with Gowran. Defendant never once complained to Gowran that the police coerced him into giving a statement. [Second Tr. at 19-20.]

Second, the length and location of the interview further support a finding of voluntariness. The interview lasted less than an hour—it began at approximately 8:39 a.m. and concluded at approximately 9:29 a.m. [Govt. Ex. 501-TR, admitted into evidence July 12, 2016.] As such, the interview was not excessively long. Moreover, Sergeant Robb testified the only reason the interview was conducted in the back of his patrol car was to protect Defendant's right to stop the search. [First Tr. at 95.] Sergeant Robb testified if the interview took place at police headquarters, the officers would have to stop the search because Defendant would no longer be present to exercise his right to stop the search.

Third, there is no evidence Defendant's maturity, physical condition, mental health, or level of education prevented him from giving voluntary consent. It is undisputed that Defendant was not handcuffed or detained, nor was he subject to physical force or threat of force; which he confirmed when he replied that "I am sitting freely in your patrol car" at the end of the interview when Sergeant Robb asked him whether he gave his statement of his own free will. [Id. at 123.] Moreover, as heard by the Court, Defendant had a lucid, responsive, and composed tone of voice during the recorded interview and gave detailed and calm answers to even personal and pointed questions by law enforcement concerning his sexual relationship with Kosnac. [Id. at 109-21.]

Fourth, Defendant was given Miranda warnings both verbally and in writing. As heard from the recording of the interview, Defendant was read his Miranda rights, stated he understood them, and then answered questions without indicating at any point that he wished to remain silent. [Id. at 100-04.] Defendant also received a written Miranda waiver card, which he initialed and signed. [Id. at 101; Govt. Ex. 202.] Sergeant Robb testified Defendant signed the Miranda waiver card without hesitation and had a "calm" demeanor when he agreed to proceed with the interview after being advised of his Miranda rights. [First Tr. at 104.]

29

Finally, although an attorney was not present for the interview, Defendant was advised of his right to have counsel present during the questioning. [Id. at 100-01.] As discussed above, Defendant stated he understood his Miranda rights—including his right to have counsel present— and Defendant signed and initialed a Miranda waiver card. [Id. at 101-02.] Accordingly, under the totality of the circumstances, the Court finds Defendant's statements to law enforcement on May 31, 2010 were freely and voluntarily made. Thus, Defendant's motion to suppress his statements is denied.

## V.     CONCLUSION

For the foregoing reasons, Defendant's motion to suppress the evidence against him is DENIED. An appropriate order accompanies this Opinion.

DATE: September 9, 2016

_____
**CLAIRE C. CECCHI, U.S.D.J.**